The final case in our call today is agenda number 20, case number 108285, West American Insurance Company v. Yorkville National Bank. I can see it, I can see it. Good morning, Your Honors. Would you like me to wait for Mr. Justice? He'll be back. Okay, fine. And I shouldn't mention that when a judge goes to the back he has both an audio and a video connection to this courtroom, so he doesn't miss anything. Okay. Terrific. Thank you, Your Honors. My name is Scott Porterfield. I have the honor of representing the appellant, Yorkville National Bank. The appellate court decision here should be reversed, and the trial court judgment should be reinstituted for four reasons. I'm going to list the four reasons just very quickly, and then I'll come back and deal with them separately. First, Your Honor, the appellate court judgment ignored this court's ruling in Cincinnati v. West American Insurance Company on actual notice, and in fact ignored 50 years of jurisprudence from this court regarding actual notice. Secondly, Your Honor, while the appellate court purportedly followed this court's opinion in the Country Mutual v. Lavorsi decision, it misapplied the factors and got that wrong. Thirdly, Your Honors, the appellate court ignored the expressed factual findings made by the trial court with no basis upon which to do so. In fact, its rulings make factual findings that aren't supported by the record. Fourthly, Your Honors, if the appellate court opinion is not reversed, it is going to set extremely bad public policy and poor precedent for insureds in the state of Illinois. I'd like to now address each of my four arguments and points. Counsel, before you do, why didn't you wait for me? I'm sorry, Your Honor. Only kidding. I do have a question for you. I was listening in there, as Chief Justice Fitzgerald said. Did you ever argue that when an insurer provides actual notice of a claim to an insurer, such notice universally trumps an insurer's right to make its own coverage determination based on exclusions other than the notice provision? I didn't see where you argued that, but I see it's an issue raised by opposing counsel. Yes, it is raised by opposing counsel. We obviously disagree with their position, particularly because, Your Honor, in this case, unlike the amicus and unlike the appellee, the only issue for which the coverage was denied was the notice. They never argued that there was any other sections of the insurance policy that applied that they were precluded from asserting, whether it's failure to cooperate, whether it was some other exclusionary policy. You didn't argue, then, that the notice provisions trump the insurer being able to make a determination on something else down the road? Absolutely, we did not. Okay. I just wanted to make sure. Yeah. Before you even got into your points as to what you are arguing, I wanted to make sure that that was the case. That is correct, Your Honor. All right. Mr. Porterfield, before you get started again, what was the defendant prejudiced by the lack of notice? How was he prejudiced? I mean, what was the prejudice here for lack of notice? Well, Your Honor, the trial court expressly found that there was no prejudice on the insurance company. We asked at trial, we asked the witnesses of West American who testified, once they received the written notice, because they were arguing, of course, and West American is focused only on the written notice that was received in January 2004, and there was a trial coming up a few months later. West American argued, well, undoubtedly, we were prejudiced, and they just state that bold conclusion. When we asked their two witnesses at trial, particularly their one, Mr. Schiller, we asked them, did you ever ask to see the claims file or the litigation file? Did you ever go to review the deposition transcripts? Did you ever sit down to see if you could get a continuance of the trial date? Did you ever do this? Did you ever do that? The answer was no, no, no. And so the trial court expressly found that West American failed to put forth any proof of prejudice. If I could go back to the first argument with regard to the fact that we believe that the appellate court absolutely ignored this court's multitude of opinions, going back to the Iowa casualty opinion in 1954 carried all the way through the Cincinnati versus West American on actual notice. The court, the appellate court, expressly rejected the application of Cincinnati and found, and I quote, that actual notice had, quote, no bearing, close quote, on this case. Going back to 1954 and this court's opinion in Simmons versus Iowa casualty, this court said that justice and reason dictate that you look at the substance of the notice over a form of notice. And that's a theme that this court has carried through for at least the last 50 years. In state security versus Burgos, this court ruled that an oral notice to an insurance broker was sufficient to constitute actual notice to the insurance company. And the court in Burgos spent some time talking about how the fact that the insurance company had cloaked the broker with apparent authority such that that broker was the agent of the insurance company for the purpose of receipt of the actual notice. And because the court found that the broker was an agent, had apparent authority to act as the agent for the insurer, then the actual notice to that broker was sufficient. Here, we actually don't even have to fight that issue because they stipulated that Zyder Dixon and Mr. Richard Dixon are their agents. And when you go on their website, the West American Insurance, they list their approved agents. Zyder Dixon is their agent. The policy listed agent Zyder Dixon. They've stipulated in the trial stipulations that were submitted the day of trial. So here, we're even stronger than Burgos because we were dealing and having oral conversations with their agent. For legal purposes, we were talking directly to West American. When Mr. Liggett was talking to Mr. Dixon, for all legal purposes, he's talking directly to West American Insurance. And he's describing the location of the suit. He's describing the allegations of the suit. And under Cincinnati versus West American, the standard is that the insurance company have notice sufficient they could locate and defend the litigation. And this court went on to say that to locate and defend means you have to have notice that a suit's on file, which we clearly told them the Kuzma suit was filed. And you have to have notice that the allegations in that suit potentially fall within the coverage of your policy. Here, we expressly stated to the agent that this was a claim of defamation. And again, at trial, the Zyder-Dixon agent, Mr. Otteson, conceded that defamation is covered within their general liability policy. He knew it. Mr. Dixon knew it. So there was no doubt here that we've satisfied the prongs for locating and defending the suit with those oral conversations that occurred in late 2001 or early 2002. Yorkville was told on a number of occasions, however, that there was not coverage, right? That is correct, Your Honor. And the written notice actually corresponded to when Yorkville did find out that there was coverage through some third party? That is also correct, Your Honor. And that's again why the trial court expressly found that this notice was sufficient and I think was a little incredulous that West American was arguing that they shouldn't have a duty to defend this case when their agent, being asked about the coverage for the Kuzma litigation for a defamation claim, said there's no coverage. Is there a factual question as to whether or not West American's agent told Yorkville there was no coverage? No, Your Honor. There's absolutely no doubt about it. And I want to address a point that the concurring opinion colors this and tries to, in a way, scare the court of these issues by saying, oh, you're going to get embroiled. When you talk about actual notice, you're going to get embroiled in a he said, she said battle. That's literally the language the concurring opinion uses here. And in fact, the author of the majority opinion talks about conversations that allegedly occurred between Mr. Liggett and Mr. Dixon. Your Honor, Mr. Liggett testified as to these conversations he had with Mr. Dixon. They never called Mr. Dixon at trial. So those conversations were unrefuted. There's no he said, she said. There's just he said. Conversations and direct unrefuted evidence as to what Mr. Liggett conveyed to Mr. Dixon and then what Mr. Dixon said back to him about the fact that there's no coverage here. I'd like to go on to my second point, Your Honor. And that is, Your Honors, that the appellate court ignored, expressly ignored the Cincinnati versus West American case, found actual notice had no application to this matter in reversing the trial court, and attempted to rely on this court's opinion in Country Mutual versus Lavorsi. But it did no balancing of the five factors that this court set forth in Lavorsi. It only rendered a review of one of those factors, and that was prejudice. And the appellate court concludes, again, with no basis in the record to say, well, undoubtedly the insurance company was prejudiced by this 27 months late notice from the time of the claim to the time of receipt of the written notice. And that's the only factor the appellate court looks at. It ignores the other four factors in Lavorsi. But fundamentally, what's of error there is the appellate court, on its own, makes a factual determination or conclusion regarding prejudice when the trial court expressly went through the evidence and said, the evidence showed no prejudice. So I believe the second basis for reversal of this decision is that the appellate court misapplies this court's directive and holding in the Country Mutual case. The third point I wanted to make, Your Honors, is that the appellate court, in order to justify its opinion, both the majority opinion and the concurring opinion, ignores the trial court record and ignores the fact that, as I mentioned before, there was no he said, she said. There was only a he said. Mr. Liggett testified at trial. Mr. Dixon, who was their agent, they never saw fit to bring him to courtroom. He wasn't there. So all of these conversations between Mr. Liggett for the bank and Mr. Dixon from the insurance company were absolutely unrefuted. So when the majority opinion and the concurring opinion talk about conversations that allegedly occurred, and they talk about a he said, she said, that's just wrong. They are ignoring the trial court's findings in order to justify their conclusion here. For whatever reason, the appellate court must believe that the Cincinnati holding on actual notice is anathema to them. And so they're finding a way, in my opinion, to manipulate around that. And they absolutely expressly ignore the trial court evidence. And the issue of prejudice, again, Your Honor, is one of those points where the majority opinion says there was prejudice here when the trial court, in its opinion, went through the five factors of Lavorsi, one of them being prejudice, went through the evidence that was basically solicited through cross-examination of West American's witnesses to show they didn't have any prejudice as a result of this alleged late notice. Fourthly, Your Honor, I believe very strongly that if the appellate court opinion applies, it sets a very dangerous precedent. And it sets poor public policy for insureds in this state. I'm confident that whatever this court rules as its opinion, one way or the other, will clearly be read by insurance counsel throughout the state. As you know, they submitted amicus brief from some insurance industry representatives. All the insurance companies have good counsel, like Mr. Chemers, who will advise their clients of whatever the dictates of this court are. But you've got millions of insureds here that have homeowner's policies, auto policies, renter's insurance policies, et cetera, who will never read this court's opinion and never be made aware of it. And they're going to continue to do what insureds do day in and day out, just like West American's own witnesses admitted. What do people do when their house gets on fire, or you're an offender bender, or you have a claim? You call your agent. That's what we all do. Mr. Otteson, who was West American's agent, admitted that. He said, one of my jobs is to accept claims, and most of them are over the phone. Mr. Schiller, who was West American's agent, or representative, he's an employee from their home office who testified, said, we have a national phone call center for accepting claims over the phone. That's the way people have been doing it for decades. If we now have a precedent where you can call your agent or broker and give notice of a claim, but the insurance company can later deny coverage if they don't get a written notice of the exact claim that they were made aware of over some fixed period of time, I think that is going to be poor public policy and set up a trap for millions of insureds in this state. For all those reasons, Your Honor. Does that mean, counsel, that a contract between the insurance company and the insured can't require written notice? I mean, you're saying that actual notice trumps whatever the contract says. Well, I think it does in this case, Your Honor. I'm not going to go so far as to say it will trump it in every case, but in this case, I think it does for this reason. In this policy, and I apologize, because quite frankly, in rereading our briefs last night, I don't think we did a good enough job highlighting this point for this Court, but West American's policy has two notice provisions. The policy says that if there is a claim or suit, we are to notify them as soon as practicable. Notify. No modifier there for written or oral. It just says you are to notify us as soon as practicable. On the plain wording of that language, an oral notification is sufficient. The policy contains the separate requirement that you send them a written notice. I think in that context, Your Honor, we have fulfilled the contract clearly because we did notify them of the suit. And I think in this instance, we satisfied the policy. I will say, though, that even if that other notification wasn't in the policy and it just simply said you must notify us in writing, period, if they have actual notice, I think based on the language of this Court, going back to Simmon, Burgos, and Cincinnati, yes, I think actual notice trumps that language because then, Your Honor, the intent of that contractual provision has been fulfilled and satisfied. I don't think they could, in good faith, argue that we haven't complied on a material term of the contract if they've received notice. So for those reasons, Your Honors, I would request that this Court reverse the appellate court and reinstitute the trial court's judgment. Thank you. Mr. Chief Justice, may it please the Court, counsel, for the plaintiff appellate, Robert Chemers from Pretzel and Stauffer in Chicago, I'd like to introduce my associate, Christopher Cassidy, who worked on the briefs with us. We have heard the four reasons why this Court should reverse, and I disagree, needless to state, with all of them. The idea of actual notice that has been discussed by counsel for the bank throughout the briefing and the oral argument is not the concept of actual notice that this Court created in September of 1998 in the Cincinnati case. In that case, the Court made a very specific test under very specific facts. The test for actual notice requiring an insurance company to provide a defense to an insured was two-pronged. One, knowledge that a cause of action has been filed, and second, that the complaint falls within or potentially within the coverage of the policy. Now, in that case, it was a very different fact situation.  Because it had been defending its named insured for three years, and on the eve of trial, through defense counsel, announced to the co-defendant, oh, by the way, you're an insured under the policy as well. That entity, I'll go back. Lauren Kessel falls off a roof, files a construction suit against Baird, an insured of Cincinnati, and B&D contractors, an insured of West America. Cincinnati defends Baird. West American defends B&D. Case goes on. Interrogatories are served. Are you an insured under any policy? And if so, who are the other insureds? B&D, the insured of West American, says, I'm insured by West American. I'm the only insured. Case continues to go through discovery. On the eve of trial, supplemental interrogatories are sent. Are you an insured under any policy? And who are the other insureds? B&D now answers, I'm an insured under the West American policy, and so is Baird. Baird sends that to Cincinnati. Cincinnati tenders its defense to West American. West American says no. Case gets settled. Cincinnati sues West American to recover 50% of the cost of defense, 50% of the indemnity. What this court held was that, clearly, West American could not require a tender of defense by Baird because it would cause an absurd result, following the language of the Second District in the Federated Mutual case. The absurd result is you'd be telling the insurer that which it already knows. It knows of the Lauren Kessel versus Baird lawsuit. It's been handling it for three or four years. It just didn't handle it for its additional insurer. So what this court said was, you don't need a tender of defense. You don't need it where you have actual notice. You know that a cause of action has been filed. Unmistakable there. And you know that the complaint falls within or potentially within coverage. It had been defending its named insured. It ignored the additional insured. So what this court said was, when an insurer is armed with that actual notice, it must go to the additional insured and ask, do you want our assistance or involvement? If there's no answer, the duty to defend has been discharged. If there is an answer, then that carrier takes a coverage position. Two cases in Illinois, only two. Not Simmon. Simmon was a tender case. The Burgos case was a tender case. Only two cases involved actual knowledge by an insurer where tender was not required. Federated Mutual versus State Farm out of the second district, which created the conflict when the third district decided, Cincinnati versus West America, and Cincinnati out of this court. They're the courts that have said, actual notice, under the circumstances of that test, will not require a tender of defense. Now, in this case. Mr. Chambers, is there any significance that Yorkville notified its agent and was told that there was no coverage under the policy? Well, if your honor considers, notice by ambush, when an agent is in a bank doing his personal banking and is taken aside by the bank president and asked a cobbled together hypothetical in a he said, she said situation, in the he said, she said language, it's not Justice Schmitz. It is Jim Leggett's. Page eight of the brief we filed, we cite Leggett's testimony. Dixon stopped in, came into the bank, we shook hands, we sat down, had some discussions about other things, I think. I told him, this is Leggett speaking, I told him that we were involved in this defamation lawsuit in Ottawa. That it was kind of a he said, she said sort of thing, and the DNO insurance didn't cover that type of suit. Then I asked if the Zyder-Dixon policies would cover the suit. The answer was, probably not. Now, is that notice to an agent? I would ask this court, you probably have law clerks that are a lot smarter and more sophisticated than a central Illinois small town insurance agent. Find that lawsuit based on those facts. You couldn't do it. First of all, there is no general depository or repository of lawsuits in the state of Illinois. They didn't name the plaintiff. The suit wasn't pending in Ottawa. It was in Joliet. It was in Will County. How do you find the suit? Where is the satisfaction of the two-pronged test this court created in Cincinnati versus West America? Mr. Chambers, were there more times that the two spoke other than that one? With Dixon, no. Now, bear in mind, Your Honor, that Mr. Leggett, who claims he had this discussion, admitted at trial. He didn't even tell his bank's board of directors about the lawsuit for one year. And then he told them at a board meeting where he repeated basically the same thing that he said to Dixon. Did he tell any agent of the insurance company? He testified. He testified, Leggett testified he had a similar discussion with Joel Addison. Joel Addison testified it never happened. Joel Addison testified that he learned of the lawsuit against the bank for the very first time 27 months after it was filed when he was called by Ben Weidman, the bank vice president, who said, I've been sued. I want to know if my homeowner's policy covers it. During which discussion, Addison testified that he asked about the details, the who, what, when, and where that the policy requires. And he was told the co-defendant was the bank. What did Addison do? Probably what a reasonable, prudent, competent agent would do. He got on the phone and called Leggett and said, tell me about the lawsuit. I just heard about. He then went into the basement of his agency and located the policy. Within hours, Leggett faxed the lawsuit 27 months later to the agent at January 19th, 2004. Back to that first discussion, though. Whose obligation is it? I mean, it wasn't in Ottawa. He didn't name the plaintiff. But he gave basic details as to the cause of action, the defamation case and what have you. I'm not saying that would be sufficient for some type of written notice. But at that point, with the limited information that he gave, he talks to an agent in the bank or elsewhere, and the agent says probably not, probably no coverage. That's right. Now whose obligation is it? Does the agent say, hey, get me a few facts? Where is it? Who is it? What's it involved? All the questions. He says there's probably no coverage based on just that limited set of facts that was given to him by the bank. He gave a curbstone opinion to what he perceived to be a hypothetical question by a bank president while he was, I call it notice by ambush. He wasn't there for the purpose of rendering an opinion. Any more than he was at a board meeting of the bank for the purpose of acting as an insurance agent when he heard the bank was sued. Again, with very indefinite facts. Plus there's no testimony here as to the duties or obligations of an agent. I suppose it's a lot like being at a Little League game. And you're sitting next to a doctor and you say, doctor, I got this red mark on my neck. What do you think it is? Oh, it looks okay. The person dies two weeks later. Is that malpractice? Of course not. Any more than this is the duty or obligation of an insurance agent when basically grabbed in an unusual circumstance at an unusual time when he's doing his personal banking business and he's asked a hypothetical question. After he's told- We don't have the same case, Mr. Chambers. If that agent, instead of saying probably not, it said put it in writing and send it to me and we'll take a look and see whether there's coverage. Then not only is there actual notice, there's written notice. Correct. And that's why I asked you, where does the obligation fall? Well, there was no testimony as to where the obligation fell. And bear in mind, the bank president just told the agent that the DNO carrier said there was no coverage. So the agent's comment was probably not. Now, the bank president could have said, carrying out his fiduciary obligation to his shareholders and his board members, oh, by the way, here's a copy of the lawsuit. We all wouldn't be amazed at the size of the stacks in front of each of your honors that that's what this case represents. It's a notice case. Pure and simple. And the notice was given 27 months late. It was given, bear in mind, by a bank president who met with the lawyer who claimed she was defamed in November of 2000, shortly after it occurred in the public restaurant in Ottawa. She goes to the bank president, sits in his office and says, I'm going to sue you. Now, you heard about the notice provision of the policy. There's a notice provision that when you're told you're going to be sued, there's a claim. They didn't report it. That was in November 2000. September 2001, the lawsuit's filed. Do they report it? No. What do they do? They gave it to their lawyer, Dan Kramer, who's not with Mr. Kramer's local attorney. Mr. Kramer handles the lawsuit. Another year goes by. September 2002, the bank president tells his own board about it for the very first time. No more descriptive than what he allegedly told Dixon. He said, she said thing by Koosman, wrong name, in Ottawa, wrong venue. That we were sued, and that was it. Kind of cavalier, it's in the minutes of the board meeting. It's then referred to again in November and December 2002, and then nothing. Nothing until the phone call from the bank vice president to the agent, Addison, saying, I've been sued. I want to make a claim. The agent then calls the bank and winds up getting the lawsuit. Now, what the appellate court did here was it rejected the concept of actual notice that was applied by the trial judge, because it was wrong. The trial judge took the policy and excised the term written notice and put in actual notice. The trial court thinking that these near miss, impromptu, in passing conversations, board meetings, and conference calls, which the trial court himself said, and he said it with a lot of concern, a local attorney and a local bank vice president, I find these conversations never occurred. So the chief witness for the bank, his credibility is put way into issue. That having been said, the actual notice concept applied by the trial court were about a series of near misses, which I suppose is not like trial court error, that if you have a lot of it, the cumulative effect of the error could cause a reversal. The cumulative effect of near misses don't add up to actual notice. They don't satisfy this court's Cincinnati test. That is, having the complaint so that you can determine if the claim falls within or potentially within coverage. That is a determination that this court has said in case after case after case,  Read the allegations of the complaint in light of the four corners of the policy. And if the insuring agreement admits to coverage, you have a duty to defend. Duty to defend is broader than the duty to pay. You can't do that based on sitting across the desk with a bank president saying, it's a he said, she said thing. How do you compare that? Yes, your honor. So I know what I'm working with. Seems to me that the argument here is that there was no actual notice. The argument is not the effect of actual notice is it wasn't. That is correct. The actual notice that this court contemplated by its test in Cincinnati was not the actual notice that the trial court applied to enter judgment at first for the bank, which is why, contrary to what Mr. Porterfield said, the appellate court reversed. They reversed because the Cincinnati test wasn't met. This court's test in Lavorsi, the country mutual case, was met. That's the test of reasonableness. You look at the factors. And the factors when applied. And one of the fact, Justice Berkey, you asked about prejudice. That's just one of the factors. The panel of this court in Lavorsi said, you don't need to have prejudice to establish breach of the notice condition. It is but one factor. The other factor is specific language of the policy. The language of the policy required notice of an occurrence. They didn't get it. Liggett told Cramer, investigate this. We don't know what Cramer did with it. But a year, no, not a year goes by. About 10 months goes by, and then the bank sued. Then they sit on that for a year before it's even mentioned to their own board. Was there an actual notice issue in country mutual? In country mutual, no, the party stipulated that notice had not been given for 20 months. And the question to this court was, was a lack of prejudice sufficient to relieve the insurer of its duty to defend? And this court held the lack of prejudice is but one factor. In other words, Illinois is one of only four states in the United States that does not require prejudice for an insurer to be relieved of its duty to defend based on late notice. It's one factor among others. The other factor is a specific language of the policy. Well, near misses don't satisfy those requirements. The other one is sophistication of the insured. Well, this is a bank with a president who's educated, who has a fiduciary obligation to his shareholders and his board. He has a lawyer. What did he do when he got the lawsuit? He gave it to his lawyer, who within a week filed an appearance. Now, the lawyer testified. I thought Liggett was taking care of insurance matters. That was part of his job. Liggett testified. I thought Dan Kramer was. Dan Kramer, almost immediately after the bank was sued, tendered it to the DNO carrier, which rejected the tender of defense. He had an exclusion for defamation. The other factor is diligence in giving notice. How were you diligent after 27 months? Even if all these near miss things even occurred, how did they think that was noticed? And what about the gut reaction of an agent who's in there doing a checking deposit on a Saturday morning? The gut reaction of an agent to a cobbled together hypothetical is being sufficient to not turn it into the insurance company. What we have here is a very simple act was not done. The knee jerk reaction to getting a lawsuit should have been put it in the mail, get it to the agent. Let the agent deal with it, and we'll hear from the insurance company. They never did that until the agent called in January of 2004 and said, send me the lawsuit I heard about from Ben Weigman, your vice president. There might be coverage. Ignored the factual findings. The court didn't ignore them. They rejected them. Bad public policy. This is insurance notice. This will affect lawyers like myself, who do a lot of insurance coverage litigation in a large insurance defense law firm. We'll deal with that. I know public policy. The public policy was created by this court in two cases. The Cincinnati case, as I've said about that when I lost it 11 years ago, but you do this long enough, you start arguing your own cases. Bad public policy, a difficult thing to deal with. How many cases have come down since Cincinnati involving an issue of actual notice? And I'll tell your honors, this one. There's one other case in the first district that involved an additional insured endorsement. And they said, you can't argue Cincinnati in a case like that because you don't know who the insureds are. Because what this court said is, if you're aware that someone isn't insured that's been sued, you've got to reach out. You have to ask, do you want our help? That's the essence. That's a good rule. That created a lot of business in the state of Illinois for insurers. Bad public policy. It's not bad public policy to write an opinion that says the written language of an insurance policy, which expresses the intention of the party, should be enforced as written. Whereas here, it is clear and unmistakably unambiguous. No contention whatsoever that the notice provision here, which is no different, no different than the notice provision this court dealt with in Cincinnati in 1998, or in the Country Mutual versus Livorsi case a few years ago. It's the identical language. Clear and unambiguous. And we'd ask this court for all those reasons to affirm the judgment of the appellate court. Was there any questions? Thank you, your honors. Your honors, I just want to address two quick points in response. There was some, well, not even some description. There is just a bold statement that these conversations between Mr. Liggett on one hand and Mr. Dixon on one hand are a cobbled together conversation in passing hypothetical. If you look at pages five through eight of our initial brief, we cite to the record where we cite the description in the trial record of the conversation between Mr. Liggett and Mr. Dixon. The Kuzma suit was mentioned. The defamation piece was mentioned. Yes, it was a conversation, quote, in passing, if that's how you want to characterize it. But it was between a president of a bank and his biggest client, or the agent's biggest client, the bank, a client that he had been placing insurance with for 20 years, and whom he sat on the board of directors of this bank, and whom he sat on the board and heard in a couple board meetings reference to the Kuzma suit being a defamation suit. So I'll just reference you to those record sites about these conversations. Mr. Chief Justice, you asked, isn't this really a case about actual notice? And in response, counsel said, yes, the appellate court found there was no actual notice. It's not exactly what the appellate court said. The appellate court said actual notice doesn't have any bearing on the case. The appellate court rejected the whole review of whether there was actual notice. And I said, we're not even going to look at that issue. So I differ with how counsel characterizes what the appellate court did. The appellate court ignored actual notice. And I think this court, throughout the history of its cases on notice, and as articulated in Cincinnati, West American, and Lavorsi, I think actual notice does matter. Would your agreement, Mr. Porterfield, would you agree with Mr. Chemeris that if this court determines this case based on, rather than what the appellate court said, which you just articulated, what Mr. Chemeris said is the issue here, that in this case, there was no actual notice. If this court determines, and I know that's not what you want this court to determine, I'm just asking, if we do, does that diminish your public policy argument? I think based on the record, it doesn't, particularly because, Your Honor, the record here for this court to find there was no actual notice, based on the standard of West American, of being able to locate and defend the suit, where the trial court has found and made record findings of testimony of what was said, what notice was given orally, and then you have a factual determination that there was enough information to locate and defend the suit. First of all, I don't think, with all due respect, the court should reverse the finding that there was actual notice. I think, though, then you're going to be in a danger zone if you're saying these conversations with an agent who tells you there's no coverage doesn't constitute actual notice. If that's where the court would come out, I think the public policy argument still holds. Thank you. Thank you, Your Honors. Thank you, Counsel. Case number 108285 will be taken under advisement as agenda number 20.